## PROOF AS TO INTENTION IN HAVING BURGLARS' TOOLS IN POSSESSION.

Circuit Court of Lucas County.

RALPH MARTIN, ALIAS HOWARD COX, V. THE STATE OF OHIO.

Decided, April, 1911.

*Criminal Law—Prosecution for Having Burglars' Tools in Possession with Burglarious Intent—Weight of Evidence as to Intention— Time and Place when it was Intended to Use the Tools Need Not be Shown.*

In the trial of one charged with having burglars' tools in his possession with intent to use them burglariously, it is not necessary that the state prove the exact time and place at which the defendant purposed to use the tools, or that he purposed to use them within the jurisdiction in which the arrest was made and the trial is held; but it is sufficient if the evidence convinces the jury beyond a reasonable doubt that it was his intention to use the tools found in his possession burglariously.

*Thos. H. Murphy,* for plaintiff in error.

*A. F. Connolly* and *Roy R. Stuart,* Assistant Prosecuting Attorneys, contra.

KINKADE, J.; WILDMAN, J., and RICHARDS, J., concur.

Indictment for carrying burglar tools with the intent to use them burglariously.

The plaintiff in error here was indicted by the grand jury of this county for having burglar tools in his possession with intent to use them burglariously. He was tried and the jury found him guilty as charged. The case is here on error to reverse the judgment entered upon this verdict of the jury.

It was said in opening the case for the plaintiff in error here that another error was sought to be presented by the bill of exceptions, misconduct of counsel in argument, but the trial judge erased the statement placed in the bill by counsel, so that is not a matter for consideration here. The two grounds of error relied upon here are:

First.  The charge of the court.

Second.  Insufficiency of the evidence to sustain the verdict returned by the jury.

.It is said that there is no evidence in this record from which the jury could have found properly, that the defendant had these tools in his possession with intent to use them burglariously, and therefore that the verdict can not be sustained.  And we were earnestly asked by counsel to read this record with care to discover, as counsel stated he had discovered, that it was devoid of evidence justifying the finding of the jury.  A serious thing if true.  We have read the record as urged by counsel and have read it with care.  The members of this court, while at the bar, have tried many criminal cases.  All of us have been upon the common pleas bench and have heard scores of criminal cases, so we feel qualified to judge of the character of the evidence presented here, as to whether it shows any intent or not in a case of this character.

This man was found upon the grounds of the Lake Shore railroad at Air Line Junction, and he says at six o'clock in the evening.  The state says something like seven o'clock in the evening.  We think it is not material who is correct in this regard; he was there, and in company with four other men.  He was there admittedly, by his own testimony, for the purpose of stealing a ride to Chicago.  The other four men he said were there for a similar purpose; they had all discussed the going out of the trains, what they would do, and how they would do it, and where they would locate themselves in order to be at the best advantage in carrying out their purposes; and while there the officers of the railroad company came to them and ordered them off of the grounds; some dispute arose and they were all arrested, I believe—at least this man was—and on his person was found a bunch of keys, curiously constructed keys, quite a number of them.  There was also found on his person a revolver and a chisel, described in the indictment and described in the record as a "jimmy"—a chisel so shaped that it might be used as a "jimmy"—a search light, and some cartridges were in the revolver.

We think it clearly appears from the record that the articles found on this man were articles of a kind commonly used by burglars in carrying on their trade. In fact, it is not seriously contended they were not.

When he was arrested with these things on him he was inquired of where he got them and what he had them for, and he declined to make any statement at all. When he gets into the trial of his case he offers this as an explanation, that when the officers came to him they searched him, at least to some extent; as he says they "frisked" him. This is described to mean that the officers came near him and slapped him where he would have pockets to see if they could discover anything, but did not make a careful search. He says they "frisked" him and he says they discovered nothing for the very good reason he had nothing. He started away pursuant to the order of the officers, and was going to take a street car and come back to the city; he says that after he had gone a distance he met a boy who said the street car was the other way and not that way, so he went back to the neighborhood of his companions, intending to go the other way to look for a street car, but the dispute between the officers and the other men had progressed to such a point that the officers had evidently determined to take them all in, or take some of them in I should say. It is said sometime during that movement one of the other men came to him and said to him, "Now you have been searched and they have not discovered anything on you, and they will not search you again. Now here are these things that I have; if they find any of these things on me it will be a serious thing; therefore you take these things now and you keep them and they will not be discovered on us to our detriment." He says this is the way he came to get these things, and when afterward they inquired of him where he got them he said he did not answer them for the reason that the other men were not then out of reach of the officers and that to have told them he got them from the other men would have been the same as to have permitted the other men to be found with them in their possession; therefore, to shield the other men (he did not say that, but that is the inference), to shield the other men he declined to tell where he

got them; and when he was found and they were found on him, at no time did he offer any explanation where he got them until he comes into his trial, and then he tells this story as to where he got them and how. He seems to have had more concern about the welfare of the other men, who were practically strangers to him, than he had about himself. He now tells this story, that the reason he did not explain to the officers was that it would have been detrimental to his associates who were then trying to get away, but were not far enough away to make their escape.

He tells how he came to go to Air Line Junction; says he went up Broadway to the crossing of Broadway and the Wabash tracks prepared to take train No. 32 for Chicago; that he stepped into a saloon near there and found No. 32 had gone, and he then met these three or four men and expressed his disappointment to them that he should have thus missed his connection, and they said to him to come with them as they were going to Air Line Junction and they would all find a train out there. He then gives a curious account of how he got to Air Line Junction— curious to anybody who understands the geography of the situation, but at any rate he finally got to Air Line Junction, and then all of these things took place that he says took place.

It is argued here, that this story disposes of the question of intent. Well, if it were believed by the jury, perhaps it might, but it evidently was disregarded entirely by the jury, and after reading his story and considering its inconsistencies and improbabilities, we are unanimous in the opinion that the jury were quite justified in diregarding his story entirely, and, taking the case as it is with the goods found on him without any explanation, with himself in a railroad yard where many burglaries are committed on the railroad cars, in company with associates of doubtful character, we think the jury were justified in reaching the conclusion that they did, that this man had tools or implements upon his person for the purpose of using them burglariously.

It was said he might have had an intention to commit a burglary in Chicago or some place else, and that it was incumbent upon the state to show he had an intention to use them burglariously and presently within Lucas county. We think the statute is not limited. The statute says, whoever has in his possession

such tools, etc., with the intention of using them burglariously; this is what makes the offense complete; there may be no occasion to use them at that precise time and place; in fact it may be impossible to use them at the time and in the immediate locality where the party having them in his possession is arrested, and yet he may be guilty of the offense defined in the statute. The important inquiry is what is his intention with respect to the use of the tools found in his possession. If his intention is to use them burglariously, the exact time and place where he expects to go into business is not very material. Both the possession and the intent must be found by the jury to have been shown by the evidence beyond a reasonable doubt to warrant a finding of guilty.

We find in the record, unobjected to, an inquiry of this man whether he had ever afterwards seen any of these associates after he was found with them in the railroad yard, and whom he described as "hoboes" (he said the act of the whole of them, stealing rides on trains, is what is known as "hoboing"). He said yes, he had seen them, and when asked where he had seen them he said he saw them in the county jail here when he was in the county jail.

Now we think the jury were entitled to take into account that fact and all the circumstances and surroundings of this case. This man testified he had worked for sometime as a restaurant here. He testified as to the length of time he had been in Toledo. He was a witness in his own behalf but he called no one to testify as to his good character. His defense rested entirely upon his own statements, and when they are rejected we think there is very little, if anything, left of his defense, and it impresses the members of this court that he might have been in better standing with the jury had he omitted entirely his story or testimony and left the case as the state rested it.

We think, taking the case as a whole, that there is abundant proof here to justify the jury in finding that he had these implements upon his person with the intent prohibited by the statute.

We have read the charge of the court and find no prejudicial error in the charge. At one place the court does say that a rea-

sonable doubt is a doubt that a man can give a reason for; but in the very next sentence the court explains correctly and in detail what is meant by that expression. It has been held by the Supreme Court that that expression standing alone and unexplained does not state the rule correctly, but it has not been held that the form of statement found in this charge presents prejudicial error. We have read the charge with care and we find no prejudicial error in it. The judgment of the court of common pleas will have to be affirmed.